# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by<br>name and address)*<br><br>A pink and silver Samsung phone with a cracked screen,<br>bearing SN R58J34B958M (the "SUBJECT DEVICE"),<br>IMEI 357485/08/730800/5 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2: 21-MJ-4568

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

　See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

　See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1)<br>21 U.S.C. § 846 | Distribution and Possession with Intent to Distribute<br>Controlled Substances, Conspiracy and Attempt to<br>Distribute Controlled Substances and Possession with<br>Intent to Distribute Controlled Substances |

The application is based on these facts:

　See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Patrick J. Hazelwood*

*Applicant's signature*

Patrick J. Hazelwood, DEA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA_____

*Judge's signature*

Hon. Alka Sagar, U.S. Magistrate Judge

*Printed name and title*

AUSA: Rachel N. Agress (x0487)

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), seized on September 27, 2021 and currently maintained in the custody of the United States Drug Enforcement Administration, in Camarillo, California:  a pink and silver Samsung phone with a cracked screen, bearing SN R58J34B958M, IMEI 357485/08/730800/5.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy, distribution of controlled substances, possession with intent to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of

drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.  Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

g.  Contents of any calendar or date book;

h.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

i.  Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      j.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.   records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR SUBJECT DEVICE

3.  In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.  The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.  The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government

will not search the SUBJECT DEVICE beyond this 120-day period without obtaining an extension of time order from the Court.

   d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

    i. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICES and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

    ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

   f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that any SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

5.    During the execution of this search warrant, law
enforcement is permitted to (1) depress Jose Maris MORALES
Cabrera's ("MORALES") thumb- and/or fingers onto the fingerprint
sensor of the SUBJECT DEVICE (only if the device has such a
sensor), and direct which specific finger(s) and/or thumb(s)
shall be depressed; and (2) hold the device in front of
MORALES's face with his or her eyes open to activate the facial-
, iris-, or retina-recognition feature, in order to gain access
to the contents of any such device.  In depressing a person's
thumb or finger onto a device and in holding a device in front
of a person's face, law enforcement may not use excessive force,
as defined in Graham v. Connor, 490 U.S. 386 (1989);
specifically, law enforcement may use no more than objectively
reasonable force in light of the facts and circumstances
confronting them.

6.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## **AFFIDAVIT**

I, Patrick J. Hazelwood, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of an application for warrants to search the following digital device (the "SUBJECT DEVICE"), in the custody of the United States Drug Enforcement Administration ("DEA"), in Camarillo, California, as described more fully in Attachment A:  a pink and silver Samsung phone with a cracked screen, bearing SN R58J34B958M (the "SUBJECT DEVICE"), IMEI 357485/08/730800/5.

2.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy, distribution of controlled substances, and possession with intent to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

and in part only and all dates, times, and amounts are approximate.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Special Agent ("SA") with the DEA and have been so employed since October 2018.  My current assignment is the Ventura Resident Office.  Prior to my current assignment, I was assigned to the Los Angeles Field Division Office Enforcement Group 4.  To become a DEA SA, I attended the DEA Academy in Quantico, Virginia, for approximately four months.  I have received hundreds of hours of training in various investigative techniques, including specialized training in the recognition and processing of controlled substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia and terminology, narcotics prices, field testing of narcotics, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled substances on abusers.

5.    Through my training, education and experience, I am familiar with identifying illegal drugs, the methods narcotics traffickers use to import, manufacture, and distribute illicit and illegal drugs, the payment methods for buying and selling illicit drugs, and the methods drug traffickers use to avoid law enforcement detection, including disguising the source and illegal nature of drug proceeds.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On September 27, 2021, Jose Maris MORALES Cabrera, also known as "Viejo" ("MORALES"), and Josue Torres ("TORRES") were arrested and charged with possession with intent to distribute approximately 30,000 counterfeit Oxycodone pills and 30 pounds of methamphetamine.

7.   On September 28, 2021, the Honorable Jean Rosenbluth issued a complaint for TORRES and MORALES in case number 2-21-mj-04499-DUTY ("September 29 Complaint"), and a search warrant to search a phone seized from TORRES's truck and a phone seized from MORALES's person in case number 2:21-mj-05000.

8.   Following his arrest, MORALES told law enforcement that he had additional drugs at his residence, located on Alabama Ave in Canoga Park, CA (the "Alabama residence") and provided consent for law enforcement to search the Alabama residence, where MORALES was a tenant.  The landlord at the Alabama residence also provided oral consent for law enforcement to search the residence.  At the Alabama residence, MORALES identified a suitcase belonging to him which contained approximately two kilograms of a substance that later tested positive as fentanyl.  The SUBJECT DEVICE was also recovered from the floor of the living room, next to the couch where MORALES had been sleeping for the past two weeks.

9.   The SUBJECT DEVICE is currently in the custody of the DEA in Camarillo, California.

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my investigation to date, my review of law enforcement reports, conversations with other law enforcement officers and a Confidential Source working for the DEA ("CS2")[1], and interviews of TORRES and MORALES, I believe the following:

**A.   TORRES Distributes Narcotics to A Confidential Source on August 31 and September 9, 2021, and is Aided and Abetted in an Attempt to Do So by MORALES on September 27, 2021**

11.   On September 28, 2021, the Honorable Jean Rosenbluth issued a complaint for TORRES and MORALES in case number 2-21-mj-04499-DUTY ("September 29 Complaint"), and a search warrant to search a phone seized from TORRES's truck and a phone seized from MORALES's person for violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); and 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (aiding and abetting possession with intent to distribute controlled substances) in case number 2:21-mj-05000.  The affidavit in support of the criminal complaint and search warrant is attached hereto as **Exhibit 1** and incorporated herein by reference.

12.   As described more fully in the affidavit in support of the criminal complaint and search warrant, on August 31 and

_____

[1] CS2 is being paid to assist law enforcement.  CS2 has been working with local law enforcement and the DEA since approximately 2010.  CS2 has known convictions for the following crimes: possession and transportation of a controlled substance, violating a court order to prevent domestic violence, and driving under the influence.  CS2 has provided information in the past that has been corroborated and led to the seizure of narcotics.

September 9, 2021, TORRES sold methamphetamine and counterfeit Oxycodone pills, suspected to contain fentanyl, to an individual whom TORRES believed was a customer, but who was in fact CS2, a confidential source working for the DEA.

13.   Then, on September 27, 2021, TORRES possessed with intent to distribute and attempted to sell 30,000 counterfeit Oxycodone pills and 30 pounds of suspected methamphetamine to CS2, aided and abetted by MORALES who was armed with a loaded gun.

**B.   Tracking Device Shows TORRES Stopping at MORALES's Residence on the Way to the Deal**

14.   Previously, on September 8, 2021, I obtained a tracker warrant on TORRES's silver truck.  The warrant was signed by the Honorable Allison H. Goddard, U.S. Magistrate Judge, in Case No. 21-MC-1294, in the Southern District of California.  On September 9, 2021, law enforcement installed the tracking device on TORRES's silver truck while CS2 and TORRES were meeting at Starbucks in Thousand Oaks, in the Central District of California.

15.   On September 27, 2021, the tracking device showed the silver truck leaving an address in San Diego affiliated with TORRES, and driving up to the Los Angeles area.  The truck made a 40-minute stop in Canoga Park in the proximity of Alabama Ave, but the precise address could not be determined from the tracking device.  The tracking device showed the truck made one additional stop at a grocery store before heading to the

location where TORRES had agreed to meet with CS2 to conduct the transaction, a Lowe's parking lot in Thousand Oaks.

### C. Execution of Arrests and Mirandized Statements by TORRES and MORALES

16. Based on conversations with a Spanish speaking member of law enforcement who listened to the audio transmitting device and members of law enforcement who surveilled the meeting and interviewed TORRES and MORALES, as well as conversations with CS2, and interviews of TORRES and MORALES, I know the following:

17. At approximately 1:12 p.m. on September 27, 2021, agents converged on the meeting location and arrested the driver of the silver truck (TORRES) and the passenger (MORALES).

18.   At approximately 1:25 p.m., in the Lowe's parking lot, after being advised of his Miranda rights, TORRES stated the following, among other things:

a.   TORRES stated that MORALES goes by "Viejo" (translated as "old man" in Spanish) or "Jose."

b.   TORRES stated that he went to an address provided to him by MORALES that day, and picked up MORALES and the bag which was found to contain the narcotics.

c.   TORRES further stated that MORALES had sent him the pick-up address on WhatsApp, and showed the investigators a WhatsApp message from an individual saved in TORRES's phone as "Jose Socio" (translated meaning is "Jose Business Partner/ Associate").   The message contained a link with an address. This address corresponds to the approximate location where the

silver truck stopped for 40 minutes prior to the deal, based on data from the tracking device.

19. At approximately 1:35 p.m., in the Lowe's parking lot, MORALES was informed of his <u>Miranda</u> rights, with a Spanish speaking translator in a recorded interview. The interview was terminated when MORALES indicated that he wanted to speak to an attorney.

20. At approximately 1:40 p.m., a law enforcement officer was standing with MORALES for safety purposes. MORALES asked what agency the law enforcement officer worked for. The officer told MORALES that he worked for local law enforcement, but that the case involved federal agents. MORALES asked the officer about the potential sentence he was facing, and the officer told him that federal offenses involve higher sentences, but that transparency could lead to a reduction in sentence.

21. In response, MORALES indicated that he wanted to be forthcoming and pointed to where his apartment was located on a map that the officer pulled up on his phone. The location he pointed to was the Alabama residence. MORALES also provided a description of which apartment he lived in. MORALES told the officer that he had additional things at his residence that were dropped off the prior week.

22. Local law enforcement then reached out to members of the DEA team. A DEA agent and Spanish speaking translator engaged in a further conversation with MORALES, including the following:

a.   The DEA agent asked MORALES to confirmed that he had received Miranda warnings, and MORALES confirmed that he had.

b.   The DEA agent asked whether MORALES wanted a lawyer and MORALES responded that he wanted to provide information to law enforcement to potentially lessen the severity of his sentence.  MORALES stated that he had additional narcotics located at his apartment.  When asked about type and quantity of drugs he said "2-3."  Based on my training and experience, I understood this to mean two to three units of an unspecified type of narcotics.  MORALES informed law enforcement that he lived in the apartment with another individual, later identified as L.K.

c.   The consent to search form was read to MORALES in Spanish.  MORALES then signed the consent to search form for the Alabama residence.

d.   Law enforcement drove with MORALES to the Alabama residence.

e.   At the residence, law enforcement interviewed the individual who resides there, L.K.  L.K. confirmed that MORALES had been sleeping on L.K.'s couch for the past two weeks.  L.K. stated that MORALES agreed to pay L.K. a monthly sublet fee of $625 a month but had not yet made any payments.  Law enforcement asked for and received verbal consent from L.K. to search the residence.  L.K. told law enforcement that MORALES stored two suitcases in L.K.'s bedroom.

f.   MORALES pointed out two suitcases belonging to MORALES that were located in L.K.'s bedroom.  One of the suitcases contained male clothing covering two bricks of white powder, totaling approximately two kilograms.  MORALES said he did not know which type of drugs the bricks were.  The bricks were field tested, and the suspected narcotics tested positive for the presence of fentanyl.

g.   At the Alabama residence, law enforcement also saw the SUBJECT DEVICE, lying on the floor in the main living area room, next to the sofa where MORALES had been lodging.  Law enforcement asked MORALES if it was his phone and he responded that it was.  MORALES also provided the passcode for the SUBJECT DEVICE to law enforcement.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

23.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

24.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

25.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   26.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

      a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which

12

may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

27.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the

13

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MORALES's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MORALES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  28.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

  29.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st day of
October, 2021.

_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE